UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

------------------------------------------------------

| | : | |
|---|---|---|
| CHEVRON PRODUCTS COMPANY, | : | CASE NO. 5:05-CV-2007 |
| | : | |
| Plaintiff, | : | THE HONORABLE JAMES S. GWIN |
| | : | |
| vs. | : | ORDER AND OPINION |
| | : | [Resolving Doc. No. 37] |
| CASCADE DISTRIBUTING, INC. | : | |
| | : | |
| Defendant. | : | |
| | : | |

------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

This action involves a dispute over two contractual agreements between Plaintiff Chevron Products Company and Defendant Cascade Distributing, Inc. Formed in May 2001, the parties' agreements provided, *inter alia*, that Cascade would serve as a nonexclusive distributor of Chevron's military lubricants to the federal government. The agreements also obligated Chevron to provide Cascade with a $300,000 cash advance, repayable under an amortization plan, to develop the market and facilitate the products' distribution.

Arguing that Cascade has not paid its existing debt under the contracts, Chevron seeks summary judgment on its breach of contract claims against Cascade. [Doc. 37.] Chevron also moves for summary judgment on Cascade's various contractual and tort-based counterclaims. Cascade opposes the motion. [Doc. 46.] For the reasons discussed below, the Plaintiff's motion for summary judgment is GRANTED on all claims and counterclaims.

**I. Background**

Chevron is a Pennsylvania corporation with its principal place of business in San Francisco. Among other products, Chevron manufactures and sells lubrication products and services. Cascade

Case No. 5:05-cv-2007
Gwin, J.

is a Streetsboro, Ohio-based corporation that specializes in the resale of lubricants to military branch purchasers.

The parties formed the agreements at issue after Cascade conducted market research determining that Chevron had allowed Military Specification Certification ("Mil Specification") and Qualified Product Listings ("QPL") for many of its products to lapse. As a result, Cascade believed that a $36,000,000 market existed for certified or re-certified Chevron lubricants.

Therefore, in June 2000, Cascade approached Chevron to explore the possibility of establishing a reseller relationship. On May 1, 2001, the parties entered a contractual relationship with two agreements. First, the Licensed Reseller Agreement ("Reseller Agreement") gave Cascade the nonexclusive right to purchase lubricants from Chevron for resale to federal government purchasers, including the United States Navy. The Reseller Agreement also required Cascade to give sixty days' notice before terminating the agreement. Second, the Cash Advance/Amortization Agreement for Brand Conversion Program ("Cash Advance Agreement") obligated Chevron to provide Cascade with a $300,000 cash advance to research and identify federal government buyers of Chevron lubricant products. The contract established an amortization schedule, under which Cascade would repay the advance. In addition, the Cash Advance Agreement based the amortization schedule on the volume of Chevron product that Cascade sold over a three-year period. The parties also envisioned (but did not memorialize) that Cascade would use the funds to research, identify, develop, and test Chevron lubricant products to qualify them for government purchase.

Approximately two years later, in early 2003, Cascade said that it could not fulfill the agreements' purchasing and repayment requirements without modifying the agreements. Cascade told Chevron that it could succeed if Chevron obtained Mil specifications for two of the products.

-2-

Case No. 5:05-cv-2007
Gwin, J.

Chevron agreed and soon obtained the specifications. The parties further agreed to revise the terms of both agreements. In May 2003, they revised the Reseller Agreement (the "Revised Reseller Agreement") to shift Cascade's payment date from five days before delivery to sixty days from date of shipment. The parties also amended the Cash Advance Agreement (the "Revised Cash Advance Agreement") to lower the sales quota, the repayment-to-product-sold ratio, and the interest rate on the advance. Each of the revised agreements contained an integration clause, that the parties agreed to in writing.

In the summer of 2004, Cascade began becoming late on payments. Also, in October 2004, both Chevron and Cascade bid on the Defense Energy Support Center finished lubricants contract ("2005 Energy Support contract"). Although it had only a nonexclusive contract with Chevron, Cascade objected to the competition from Chevron.

On November 17, 2004, Cascade discontinued its payments on the cash advance and stopped ordering Chevron lubricants for resale. Consequently, Chevron claimed that Cascade owed it a total of approximately $783,219: $211,612 representing a balance on the unpaid cash advance and $571,607 for lubricants sold to the Navy for which Cascade had not compensated Chevron. The parties negotiated throughout the fall of 2004, but without resolution. Chevron then filed this lawsuit.

With this suit, Chevron alleges that Cascade breached its duty to pay for delivered products and to make payments as scheduled in the Revised Cash Advance Agreement. It further contends that Cascade failed to provide the requisite sixty day notice before terminating the contracts in November 2004. Chevron argues that it recognized Cascade's difficulty in meeting the sales targets and took several steps to assist Cascade: it renegotiated both agreements with terms more favorable

Case No. 5:05-cv-2007
Gwin, J.

to Cascade and it helped Cascade win the 2004 Energy Support contract.

Chevron makes the following claims: (1) Breach of the Reseller Agreement for failure to give requisite notice before terminating; (2) Breach of the Revised Amortization Agreement for failure to pay unamortized amounts due; (3) Acceleration of amounts owed under the Revised Amortization Agreement by failure to pay; (4) Breach of duty of good faith and fair dealing; (5) Unjust enrichment by failure to pay for products; (6) Unjust enrichment by failure to repay the cash advance.

Responding, Cascade says that Chevron did not assist Cascade, but rather undermined the contract. Chevron did this, Cascade says, through various actions and inactions that frustrated Cascade's ability to meet the sales targets defined in their agreement. Cascade first argues Chevron only obtained specification certification for two products, thereby undermining Cascade's ability to distribute Chevron's products to the government. Next, Cascade says that in fall of 2003, Chevron provided Cascade with delayed pricing information for those products, forcing Cascade to miss several bid deadlines. Third, Cascade contends that Chevron provided different bulk and internal pricing to B&M Enterprises, one of Cascade's competitors, for use in a contract bid. B&M Enterprises ultimately won the contract, under bidding Cascade by ten cents per gallon. Finally, Cascade argues that in the fall of 2004, Chevron directly competed with Cascade when it bid for the 2005 Energy Support contract, the same contract that Chevron had helped Cascade win the previous year.

Cascade makes the following counterclaims against Chevron: (1) Breach of contract; (2) Unfair and deceptive trade practices; (3) Failure to obtain certification and/or qualification of product, thereby frustrating purpose of agreements; (4) Failure to timely deliver products; (5)

-4-

Case No. 5:05-cv-2007
Gwin, J.

Detrimental reliance on failure to communicate false information; (6) Tortious interference with business relationship.  Cascade claims damages in excess of $1,000,000.

Chevron now moves for summary judgment on all claims and counterclaims.

## II.  Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, a court shall grant summary judgment if the evidence presented in the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  In assessing the merits of the motion, the Court shall draw all justifiable inferences from the evidence presented in the record in the light most favorable to the nonmoving party.  *Woythal v. TexTenn Corp.*, 112 F.3d 243, 245 (6th Cir. 1997). However, an opponent to a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth through competent and material evidence specific facts showing that there is a genuine issue for trial. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Miller v. Lorain County Bd. of Elections*, 141 F.3d 252 (6th Cir. 1998).

The Sixth Circuit emphasized the showing required to defeat summary judgment in *Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992). There, the Court stated: "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of evidence that the plaintiff is entitled to a verdict . . . ." The "mere possibility" of a factual dispute is not enough. Rather, in order

-5-

Case No. 5:05-cv-2007
Gwin, J.

to defeat summary judgment a plaintiff "must come forward with more persuasive evidence to support [his or her] claim than would otherwise be necessary. Where the defendant demonstrates that after a reasonable period of discovery the plaintiff is unable to produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment should be granted." *Id*. at 581 (internal citations omitted). Thus, a judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue a proper jury question.

Using this standard, the Court analyzes the parties' arguments over the present motion.

### III. Analysis

With this motion, Chevron seeks summary judgment both on its claims against Cascade and on Cascade's counterclaims.

**A. Choice of Law**

As a threshold matter, the Court must determine the applicable substantive law. "[A] federal court whose jurisdiction is based on diversity of citizenship must apply the conflict of law rules of the forum state." *Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 738 (6th Cir. 1999) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 490 (1941)). Therefore, Ohio's conflict of law rules govern here. Under Ohio conflict of law rules, parties' choice of law as expressed in the contract determines the applicable substantive law. *See Nationwide Mut. Ins. Co. v. Ferrin*, 487 N.E.2d 568, 569 (Ohio 1986). Here, the parties agreed in the contracts that California law would apply. (Pl.'s Ex. B § 9(f).) Therefore, the substantive law of California governs the interpretation of the contract terms.

Case No. 5:05-cv-2007
Gwin, J.

### B. Chevron's Claims Against Cascade

With its summary judgment motion, Chevron seeks judgment on its breach of contract claim and its claim for amounts owed under the Cash Advance Agreement. Chevron says that Cascade owes it approximately $571,607 for lubricant product it provided, but for which Cascade did not pay. Chevron says that Cascade's executives and records have admitted as much.[1]

The elements of a breach of contract claim under California law are: "(1) the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) the resulting damage to plaintiff." *Wise v. S. Pac. Co.*, 223 Cal. App. 2d 50, 59 (Cal. Ct. App. 1963). Three of the four elements are undisputed: a valid contract,[2] Cascade's breach through failure to pay, and the resulting damage to Chevron caused by the nonpayment.

Therefore, the issue turns on Cascade's argument that Chevron inexcusably failed to perform under the contract. Cascade concedes that it has failed to make payments for product delivery and on the cash advance, but it argues that Chevron's breach of implied contractual terms excuses its performance. Cascade argues that under California law, implied obligations intended by the parties but not included in the writing can be enforced. Cascade asks the Court to consider both extrinsic evidence and the two contracts in light of each other. Doing so, Cascade argues, reveals various implied contractual terms. These terms Cascade maintains, establish grounds for its affirmative defenses and breach of contract counterclaims.

Chevron maintains that it has performed all of its obligations under the written agreements.

---

[1] Chevron says that Cacade's president admitted it in his deposition. Also, in its financial statements, Cascade lists the $571,607 as an "Account payable-customer refund."

[2] In its opposition brief, Cascade purports to assert "fraudulent inducement" as a defense to the contract's validity. (Opp'n Br. 17-19.) Cascade did not plead this defense in its Answer however, so it may not assert it now.

-7-

Case No. 5:05-cv-2007
Gwin, J.

It notes that the parties signed the Reseller and Cash Advance Agreements subject to an integration clause. (Pl.'s Exs. A & D § 3.1 and Exs. B & E § 6(a)) Chevron states that the integration clause effectively binds the parties only to the terms and obligations set forth in the written agreements and prohibits consideration of parol evidence. Because all of Cascade's defenses rest on this issue, the Court considers it first.

As compared with other jurisdictions, California's parol evidence rule strongly considers the contracting parties' intent. However, the rule also makes clear that "[t]erms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." Cal. Code Civ. Proc. § 1856(a). In practice, the rule "generally prohibits the introduction of any extrinsic evidence to vary or contradict the terms of an integrated written instrument" *Gerlund v. Elec. Dispensers Int'l*, 190 Cal. App. 3d 263, 270 (Cal. Ct. App. 1992), but such evidence can be used to interpret the instrument when the parties dispute its meaning. *Masterson v. Sine*, 436 P.2d 561, 564 (Cal. Ct. App. 1968). The California Supreme Court held that "rational interpretation [of a contract] requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties." *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & R. Co.*, 442 P.2d 641, 645 (Cal. 1968).

Thus, under California law, even where a disputed contract contains an integration clause, courts will engage in a preliminary analysis of the parties' intent. In applying this rule, a court uses a two-part analysis: (1) whether the writing was integrated; and, if so (2) whether the agreement is susceptible of the meaning urged by the party offering the extrinsic evidence. *Gerlund*, 190 Cal. App. 3d at 270. Thus, the Court first determines whether the contract is integrated.

Case No. 5:05-cv-2007
Gwin, J.

A contract is integrated when the written agreement is deemed to be the final, complete and exclusive statement of the parties' intended terms. *Alling v. Univ. Mfg. Corp.*, 5 Cal. App. 4th 1412, 1434 (Cal. Ct. App. 1992). Integration is a matter of substantive law for the court to determine. *Id.* To establish an integrated writing, the court must consider the following factors: "the language and completeness of the written agreement and whether it contains an integration clause, the terms of the alleged oral agreement and whether they contradict those in the writing, whether the oral agreement might naturally be made as a separate agreement, and whether the jury might be misled by the introduction of the parole [sic] testimony." *Mobil Oil Corp. v. Rossi*, 138 Cal. App. 3d 256, 266 (Cal. Ct. App. 1982). The presence of an integration clause in the agreement is evidence of integration, but it is not dispositive. *Gerlund*, 190 Cal. App. 3d at 272.

Cascade contends that oral agreements existed that were not expressed in writing that required Chevron to seek QPL certification for its products. In support of this argument, Cascade points to differences between its contracts and other contracts Chevron had with other resellers. Also, Cascade notes that the parties formed the Cash Advance Agreement to allow Cascade to research and identify Chevron products that would be marketable to government purchasers with certification. Cascade argues that this was a key motivation for Cascade's seeking the relationship with Chevron. In addition, Cascade argues that the Revised Cash Advance Agreement required Chevron to obtain QPL certification for two of its products before Cascade was obligated to repay the cash advance attached. Chevron responds that any obligation for it to obtain and maintain QPL certification for its products would contradict the terms of the written agreement that expressly allow Chevron to discontinue or change its product specifications at anytime.

Case No. 5:05-cv-2007
Gwin, J.

The Court finds that the agreements are integrated. First, the integration clause creates a presumption that the contracts were intended to be integrated. Further, Cascade president Robert King's deposition testimony supports this conclusion. King acknowledged that the parties negotiated regarding the terms that Cascade now seeks, but that those terms were not incorporated into the final written and signed contracts. King also acknowledged that this fact meant that those terms were not part of their agreement. (King Dep. 46-48; 76-77.).

The uniqueness of the agreements further militates toward their being integrated. Cascade and Chevron both acknowledge that the Cash Advance Agreement made their agreements different from standard reseller agreements. The agreements were not the product of boilerplate forms; the parties thoroughly negotiated their terms. This strongly suggests that the writings reflect the final intent of the parties.

Having established that the agreement is integrated, the Court must decide if the evidence that Cascade offers is otherwise admissible to explain the meaning of the contractual language. It "is not whether [the contract] appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is *reasonably susceptible*." *Pac. Gas & Elec. Co.*, 442 P.2d at 644 (emphasis added). If, after considering all of the evidence, the court determines that the contract is "reasonably susceptible" to both meanings contended, the court must allow admission of all evidence that supports either meaning. *Id.*

The agreements between Chevron and Cascade are not reasonably susceptible to multiple meanings. Cascade does not allege that any of the written contract's terms are ambiguous. Neither the original Reseller nor the Cash Advance agreement specifically mentions QPL certification or

-10-

Case No. 5:05-cv-2007
Gwin, J.

Chevron's duty to obtain certification.[3] Cascade only contends that implied terms existed that were essential to optimal performance of the agreement. Without an allegation of ambiguity, the second step of the analysis is without merit. As such, the parol evidence rule excludes Cascade's extrinsic evidence.

The fact that the contract expressly disclaims several of these alleged implied duties reinforces this conclusion. These terms expressly give Chevron certain rights, the exercise of which Cascade now claims violates the agreement. First, the Reseller Agreement provides that Chevron may "make sales of the same Products and/or other Chevron products directly to any or all customers." (Pl.'s Ex. A, Reseller Agreement § 1.3.2.) Also, Cascade admits that the Reseller Agreement gives Chevron the right both to do business with other resellers and to sell products directly to customers. (Pl.'s Opp'n Summ. J. 9.)

Moreover, the Reseller Agreement provides that "Chevron reserves the right to discontinue, without liability, the production or sale of any or all of the Products, to change the specification of any or all of the Products . . . In the event that Chevron discontinues the sale of any Product or service related thereto, Chevron shall have the right, but not the obligation, to substitute another product or service of similar functionality for the one discontinued." It further states that "ChevronTexaco may, at any time, change the grade, specifications, characteristics, delivery package, brand name, trademark or other distinctive designation of any Product listed in Exhibit A and such Product, as so changed, shall remain subject to this Agreement." (Pl.'s Ex. B, Reseller Agreement §§ 2.2, 2.13.) This language is inconsistent with Cascade's suggestion that the contracts

---

[3] Given its apparent dependency on these certifications, it is difficult to understand why Cascade did not insist that the duty to obtain them become an express part of the agreements.

-11-

Case No. 5:05-cv-2007
Gwin, J.

required Chevron to obtain and maintain QPL and Mil specification certification on its products.

In conclusion, the written contracts are integrated writings whose plain language is not susceptible to the Defendant's interpretation. As such, Cascade's argument that Chevron violated several implied duties fails. Therefore, even when considered in the light most favorable to Cascade, Chevron has established the elements of its breach of contract claims. Summary judgment on each of Chevron's claims is thus appropriate.

**C. Cascade's Counterclaims Against Chevron**

As described above, Cascade also asserts various contractual and tort-based counterclaims against Chevron.

*1. Contractual Filing Period*

As an affirmative defense to these claims, Chevron argues that the contract bars the claims because Cascade did not timely notify Chevron and because Cascade did not timely file a lawsuit. Cascade responds that Chevron failed to plead statute of limitations as an affirmative defense and that it thereby waived that defense.

The Court addresses Cascade's argument first. Cascade contends that by not pleading the statute of limitations as an affirmative defense in its Answer, it waived the defense. Chevron responds that the defense is a contractual waiver, not strictly a statute of limitations, and therefore it did not need to plead it in its Answer. The Court need not resolve whether a contractual limitations/waiver provision is tantamount to a true statute of limitations period for the purposes of Federal Rule of Civil Procedure 8(c). For two reasons, Chevron's reasoning is more persuasive. First, courts have held that a party may assert the affirmative defense of waiver by contractual limitations period for the first time in a summary judgment motion, provided it does not prejudice

Case No. 5:05-cv-2007
Gwin, J.

the opposing party. *Han v. Mobil Oil Corp.*, 73 F.3d 872, 877 (9th Cir. 1995). Second, Chevron asserted the affirmative defense of waiver in its Answer. This gave Cascade notice of Chevron's argument that Cascade had waived its right to bring the counterclaims. As a result, Cascade has not shown any prejudice. Therefore, Chevron has properly raised the affirmative defense of waiver. Having so determined, the Court considers Chevron's waiver argument: that the contractual limitations period bars Cascade's counterclaims.

The contract terms in question require Cascade: (1) to notify Chevron of potential claims within sixty days of their arising; and (2) to file the resulting law suit within one year. The Court need only address the second requirement.[4] Cascade says that it met the one year filing provision: Cascade alleged breached occurred on November 17, 2004 and Cascade asserted its claims on November 4, 2005, within one year.

Responding, Chevron notes that Cascade's counterclaims did not arise from Cascade's terminating the contract. Rather, they arose from Chevron's alleged breaches, which occurred well before November 2004. Therefore, it says, the one year filing provision bars the claims.

California law allows contracting parties to agree to shorten the statutory limitations period for bringing an action, provided that the shortened period is reasonable. *Han*, 73 F.3d at 877 (citing *Beeson v. Schloss*, 192 P. 292, 294 (Cal. 1920)). Moreover, California courts generally consider a twelve-month period to be reasonable. *Id*. ("A contractual limitation period requiring a plaintiff to commence an action within 12 months following the event giving rise to a claim is a reasonable limitation which generally manifests no undue advantage and no unfairness.") (citing *Fageol Truck*

---

[4] Cascade says that it is unfair to enforce the sixty day requirement because: (1) it amounts to a modified statute of limitations, and under California law, a sixty day statute of limitations is per se unreasonable and unenforceable; and (2) the two parties were in the process of renegotiating the contract during the sixty day period after the claims arose. Chevron does not specifically address this line of argument, and the Court need not address it.

-13-

Case No. 5:05-cv-2007
Gwin, J.

*& Coach Co. v. Pac. Indem. Co.*, 117 P.2d 669, 672 (Cal. 1941)).

Here, Cascade contractually agreed to a shortened limitations period of twelve months. (Pl.'s Ex. B § 5(c).)  Cascade does not suggest that this agreement was in any way unreasonable.  The events underlying Cascade's claims occurred between 2001 and October 2004.[5]  On November 4, 2005, over twelve months after the last event, Cascade asserted its counterclaims for those actions.  Therefore, Cascade failed to file its counterclaims within one year of the "event, action or inaction to which such claim relates." As such, Cascade waived those claims and the Court will not consider them.

*2. Merits*

Chevron also argues that Cascade's claims fail on their merits.  Because the contract bars Cascade from asserting the claims, the Court need not address those arguments.

### IV. Conclusion

For the reasons discussed above, the Court **GRANTS** the Plaintiff's motion for summary judgment on each of its claims against the Defendant and this case will proceed to jury trial on the issue of damages as scheduled on June 12, 2006.  The Court also **GRANTS** the Plaintiff's motion for summary judgment on each of the Defendant's counterclaims.

IT IS SO ORDERED.

Dated: June 6, 2006        s/ *James S. Gwin*
       JAMES S. GWIN
       UNITED STATES DISTRICT JUDGE

---

[5] As Chevron rightly points out, Cascade's terminating the contract in November 2004 did not give rise to Cascade's claims, rather, it gave rise to Chevron's claims.